## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **PONCA TRIBE OF INDIANS** | ) | |
| **OF OKLAHOMA, ET AL.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 05-445 (C)** |
| | ) | |
| **THE CONTINENTAL CARBON** | ) | |
| **COMPANY, CCC USA CORP., AND** | ) | |
| **THE CHINA SYNTHETIC RUBBER** | ) | |
| **CORPORATION,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFFS' *DAUBERT* MOTION AND BRIEF IN SUPPORT

Kalyn Cherie Free, OBA No. 12298
406 S. Boulder Ave., Mezz.
Tulsa, Oklahoma 74103
Telephone: (918) 583-6100
Facsimile: (918) 583-6104
kfree@cwis.net

Jason B. Aamodt, OBA No. 16974
Wilfred K. Wright, OBA No. 16349
AAMODT &WRIGHT, PC
401 S. Boston Avenue, Suite 1717
Tulsa, Oklahoma 74102
Telephone: (918) 347-6169
Facsimile: (918) 398-0514
jason@awlex.com
wkw@awlex.com

The Walters Law Firm, LLC
Lon Walters, OBA No. 21919
Christin DiMartino, MBA No. 58068
105 E. 5th Street
Oldham Building, Suite 401
Kansas City, Missouri 64106
Phone: (816) 472-1400
Fax: (816) 472-4433
lwalters@walterslaw.com
cdimartino@walterslaw.com

R. Casey Cooper, OBA No. 1897
Christopher K. Woosley, OBA No. 16348
Andrea Stailey, OBA No. 20851
COOPER NEWSOME & WOOSLEY
401 S. Boston Ave., Suite 3300
Tulsa, Oklahoma 74103
Telephone: (918) 592-3300
Facsimile: (918) 592-7816
casey.cooper@cmw-law.com
chris.woosley@cmw-law.com

**ATTORNEYS FOR PLAINTIFFS**
*Monday, June 16, 2008*

## TABLE OF CONTENTS

I.   INTRODUCTION AND PERTINENT FACTUAL BACKGROUND ......................................9

II.  AUTHORITIES ............................................................................................................14

    A.   Some of Defendants' witness opinions do not "fit" specifically with their expertise. ..........................................................................................................15

    B.   Defendants' proposed witness' opinions are not reliably grounded in sufficient facts or data and result from the unreliable application of facts, or an ignorance of the facts of this case. ....................................................15

    C.   Some of the Defendants' witness' methodologies or techniques are not reliable. .........................................................................................................16

III. PROPOSITIONS ON WHICH DEFENDANTS' EXPERTS AND OPINIONS SHOULD BE EXCLUDED .............................................................................17

    PROPOSITION 1.   THE ENTIRETY OF DEANNE HUGHES OPINIONS OUGHT TO BE EXCLUDED BECAUSE SHE ADMITS THAT SHE IS NOT AN EXPERT IN RELATION TO MANY OF HER OPINIONS, AND WITH RESPECT TO THE OTHERS SHE HAS AN INSUFFICIENT AND INACCURATE FACTUAL BASIS FOR HER OPINIONS ..................................................................18

        A.   Mrs. Hughes was not provided relevant data upon which to base her opinions, and as a result they are not reliably grounded in sufficient facts or data and result from the unreliable application of facts, or an ignorance of the facts of this case ..................................19

        B.   Hughes misunderstands the nature of the what fugitive emissions are, a large part of the emission estimation she was asked to perform ................................................................................................24

    PROPOSITION 2.   SOME OF THE OPINIONS OF DR. HARRY ROOK OUGHT TO BE EXCLUDED INSOFAR AS THEY ARE WITHOUT ANY FACTUAL BASIS AND ACTUALLY CONTRADICT A CAREFUL STATISTICAL ANAYSIS OF THE DATA HE RELIED UPON ..................................................................25

    PROPOSITION 3.   THE OPINIONS OF DR. MILLETTE OUGHT TO BE EXCLUDED INSOFAR AS HE PROVIDES QUANTATIVE OR "SEMI-QUANTATIVE" RESULTS THAT CANNOT BE RELIABLY OBTAINED FROM THE ANALYTICAL TECHNIQUES HE PERFORMED ........................................28

    PROPOSITION 4.   THE OPINIONS OF DR. WILDE RELATING TO HEDONIC REGRSSION ANALYSIS OUGHT TO BE EXCLUDED BECAUSE HE PREVIOUSLY ADMITTED THAT HE COULD NOT CONDUCT SUCH AN ANALYSIS AND

**WHENCE HE ATTEMPTED TO HIS APPLICATION OF STANDARD METHODS IS "MEANINGLESS."**.................................................................31

**CONCLUSION** ...........................................................................................................................32

## TABLE OF AUTHORITIES

**Statutes, Regulations and Rules**

Federal Rules of Evidence  § 401……………………...…………………………….7

Federal Rules of Evidence  § 402……………………………...………………….7

Federal Rules of Evidence  § 403………………………...…………………...7, 13

Federal Rules of Evidence  § 702 …………………………...……………..7, 13

**Cases**

Daubert v. Merrill Dow Pharms., Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993) ..…7, 13, 14

Khumo Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S. Ct. 1167 (1999) ...…………15

Goebel v. Denver & Rio Grande Western R.R., 215 F.3d 1083 (10th Cir. 2000) …......7, 13

United States. v. Charley, 189 F.3d 1251, 1267 (10th Cir. 1999) ……………..……17, 26

Summers v. Missouri Pac. R.R., 132 f.3d 599, 604 (10th Cir. 1998) ……………...……15

Reed v. Smith & Nephew, Inc., 527 F. Supp.2d 1336 (W.D. Okla. 2007) ……...……7, 13

Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 970 at n. 4 (10th Cir.  2001).13

Duffee v. Murray Ohio Mfg. Co., 91 F.3d 1410, 1410-11 (10th Cir. 1996) ……...……..13

United States v. Nichols, 169 F.3d 1255, 1262-64 (10th Cir. 1999) ……...…………….13

United States v. Call, 129 F.3d 1402, 1405 (10th Cir. 1997) ……...……………………13

Friendship Heights Assocs. v. C. Vlastimil Koubek, 785 F.2d 1154,
1159-60 (4th Cir. 1986) …………………………………………………………………14

Stachniak v. Hayes, 989 F.2d 914, 924-25 (7th Cir. 1993) …………………..……………14

Daubert v. Merrell Dow Pharm., 43 F.3d 1311, 1317-19 (9th Cir. 1995) ………...…….15

Silva v. American Airlines, Inc., 960 F. Supp. 528, 531 (D. Puerto Rico 1997) …...…...14

Lang v. Kohl's Food Stores, Inc., 217 F.3d 919, 923-24 (7th Cir. 2000) ………...……..14

United States v. Markum, 4 F.3d 891, 895-6 (10th Cir. 1993) …………..…………..15

**Other Authorities**

IV Weinstein's Federal Evidence (Matthew Bender Supp. 2001) ……….…….14, 15, 16

## TABLE OF EXHIBITS

1.      Exhibit A      Freeman Report

2.      Exhibit B      Millette Report

3.      Exhibit C      Wilde Report

4.      Exhibit D      Wilde 2006 Declaration

5.      Exhibit E      Kim Pan Deposition

6.      Exhibit F      map of State Settlement

7.      Exhibit H      Property Class Area map

8.      Exhibit I      Hughes Report

9.      Exhibit J      Johnnie Little Stack Testing Memo

10.      Exhibit K      Hughes Deposition Volume 1

11      Exhibit L      Hughes Deposition Volume 3

12.      Exhibit M      Dudley Report

13.      Exhibit N      "Anytime" Email

14.      Exhibit O      McCloskey Deposition

15.      Exhibit P      Intentionally Left Blank

16.      Exhibit Q      Choquette Report

17.      Exhibit R      Intentionally Left Blank

18.      Exhibit S      Wainsborough Letter

19.      Exhibit T      Capital Project Review

20.      Exhibit T-1      Exhibit 24 from Juan Rodriguez Deposition

21.      Exhibit U      2004 Administrative Compliance Order

22.      Exhibit V      2004 Administrative Compliance Order

23.      Exhibit W      Rook Report

24.      Exhibit X        ASTM STD for finding carbon black

25.      Exhibit Y        Rook Deposition

26.      Exhibit Z        ASTM STD for composite sampling

27.      Exhibit AA     Dr. Fisher's Report

28       Exhibit BB     Millette Deposition Volume 2

29.      Exhibit CC      Data Tables from Millette

30.      Exhibit DD     Jim Bishop Deposition

31.      Exhibit EE      Map of Defendant's Sampling Locations

**PLAINTIFFS' *DAUBERT* MOTION AND BRIEF IN SUPPORT RELATING TO THE TESTIMONY OF CERTAIN OF DEFENDANTS' WITNESSES**

The Plaintiffs respectfully submit this motion to exclude certain of the Defendants' expert witnesses or portions of their proposed testimony. The Plaintiffs make this motion in accord with the Federal Rules of Evidence (herein "FRE") §§ 702, 401, 402 and 403, Daubert v. Merrill Dow Pharms., Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993), Goebel v. Denver & Rio Grande Western R.R., 215 F.3d 1083 (10th Cir. 2000); Reed v. Smith & Nephew, Inc., 527 F. Supp.2d 1336 (W.D. Okla. 2007) and various related authorities as set forth in this brief in support. For the reasons discussed below certain portions of the Defendants' proposed expert testimony should be excluded from presentation to a Jury in this matter.[1]

This brief is organized into three parts: I) a discussion of the facts and background issues relevant to this motion; II) a brief examination of the generally applicable legal standards; and III) a specific and succinct discussion of testimony being challenged by the Plaintiffs and the reasons such testimony should be excluded. This motion is and this brief is supported by a carefully presented, and complete documentary record.

---

[1] The Plaintiffs may request an extension of time to file their Daubert Motions regarding Dr. McKenna, Mr. Hayes and Mr. Potter. The Deposition transcripts of Dr. McKenna and Mr. Hayes have not yet been completed. Mr. Potter's deposition transcript was completed on June 13, 2008, three days before this motion was due. As a result, other than providing the brief listing above, this motion does not explicitly address the reasons why the proposed testimony of Dr. McKenna, Mr. Hayes and Mr. Potter ought to be excluded or limited. Plaintiffs have not yet deposed Dr. Alexander, and think it unlikely they will move to exclude his testimony, but wish to preserve that right should it prove to be necessary.

## I.   INTRODUCTION AND PERTINENT FACTUAL BACKGROUND

The Plaintiffs' claims arise from releases of "carbon black"[2] particulate matter and other malodorous, toxic waste gasses resulting from operation of the Ponca Plant.[3]  The Plaintiffs can prove by the use of scientific testing that the Defendants' pollutants are on Class properties.  <u>See</u> Exhibit A (Report of Dr. Freeman).  Defendants' and COP's testing, while varying in some immaterial respects, also proves the presence of Defendants' pollutants on Class Properties, and that carbon black has been spread widely throughout the Property Class Area.  <u>See, e. g.,</u> Exhibit B (Report of Dr. Millette).  In fact, Dr. Millette and others found carbon black on numerous properties within the Property Class Area.  <u>See</u> Exhibit EE, Map of results of many of Defendants' samplings.

To combat this fact and others, the Defendants CCC and CCC USA CORP. have hired twelve different persons to provide expert testimony in the following subject areas:

| Defendants' Experts | Plaintiffs' understanding of the areas of proposed testimony |
|---|---|
| Dr. Thomas Alexander | To sample properties for carbon black and other substances. |
| Keith Baugher | To evaluate the ConocoPhilips (COP) Refinery. |
| Wayne Grip | To evaluate historic air photos. |
| Stanley Hayes | To estimate CCC's and COP's emissions and to predict ground-level concentrations of particulate in ambient air. |
| | To opine on numerous matters, including engineering issues and |

---

[2]     The term "carbon black" is quoted because discovery and investigation have shown that the materials produced at the Ponca Plant and found on the Plaintiffs' properties and throughout the Property Class Area are not all commercial forms of carbon black, but that the Defendants' commercial carbon black product also contains other "soots" – products of incomplete production.  <u>See</u> Exhibit A (Report of Dr. Freeman); Exhibit Y, Depo. Dr. Rook at 121.  Additionally, the non-standard operation of pollution control devices by the Defendants has caused a great deal of soots to be released into the environment as products of incomplete combustion.  <u>See</u> Exhibit M (Report of Dr. Dudley at Exhibit 5. P3, ¶ 2 (letter report of Mr. LeBlanc)

[3]     The term "Ponca Plant" refers to the carbon black plant owned, operated and controlled by the Defendants in Ponca City, Oklahoma.

| Deanne Hughes | others even though she admitted no expertise on some matters she opines about. |
|---|---|
| Ron Joseph | To estimate the amount of carbon black or other substances necessary to darken a surface. |
| Dr. Christopher Long | To offer his opinions regarding historic sampling and to conduct a one-week evaluation of outdoor and indoor air quality in the Class area. |
| Dr. James McKenna | To opine regarding the condition of the bag filter assemblies at the CCC Plant. |
| Dr. James Millette | To test for the presence of and to report the "semi-quantative" volume of particulates in hundreds of samples taken with in the Class area. |
| Dr. Harry Rook | To opine that the Defendants sampling and testing was correct, but the Plaintiffs was not proper, without any factual basis. |
| Dr. Peter Valberg | To opine that the Defendants' emissions do not cause a health risk to the Class. |
| Dr. Louis Wilde | To opine about the damages to the Class. |

Additionally, Defendant China Synthetic Rubber Corporation (CSRC) has employed a single expert, Harry Potter, who opines about the separateness of the various Defendant corporate entities, a matter wholly irrelevant to CSRC's direct control of the operations at the Ponca Plant.

In this motion the Plaintiffs challenge, or plan to challenge, the proposed testimony of the following proposed expert witnesses for the following reasons:

| Defendants' Experts | Bases of Plaintiffs' **Daubert** Challenges |
|---|---|
| Stanley Hayes | Mr. Hayes modeling is based on unverified assumptions, ignores the obviously enormous quantities of fugitive emissions, and ignores the protocol of examining relevant information before applying the "AP42" factors for estimating fugitive emissions, though he claims to use the AP42 emission factor in his work. |
| Deanne Hughes[4] | Ms. Hughes opinions do not have any factual support for the conclusions that she reaches; she admits that she is not an expert on some of the matters about which she testifies, and admittedly lacks the necessary qualifications. |

---

[4] The opinions of those persons whose names are highlighted are addressed in this motion. The Plaintiffs seek the opportunity to challenge the testimony of those not highlighted for the reasons set forth in footnote 1, above.

| Dr. James McKenna | Dr. McKenna agrees that he had not been provided relevant evidence.  As a result, his opinion regarding the condition of the equipment in the Plant is limited to a snapshot in time, and as a result his opinions abut the conditions of the plant at any other time before or after his January 18, 2008 inspection are merely speculation. |
|---|---|
| Dr. James Millette | Dr. Millette attempts to present results with accuracy that is not possible using the methodology he has employed, and for which he admits a very high error rate.  Dr. Millette has also made incorrect assumptions regarding the presence of materials that he observed in his samples. |
| Harry Potter | Mr. Potter was not made aware of the facts of this case bearing on CSRC's control of the Ponca Plant.  As such, his opinions are flawed because they do not rely on data relevant to this matter, and his conclusions relating to the corporate structure of the various entities is irrelevant, misleading, and confusing.  His proposed legal analysis is inadmissible. |
| Dr. Harry Rook | Dr. Rook has no factual or statistical basis for his opinions.  His opinions that other experts have done a good job or a bad job invade the province of the fact finder, are duplicative, and are not helpful. |
| Dr. Louis Wilde | Dr. Wilde's opinions are not reliable because he has professed an inability to perform the very same analysis he attempted, but failed.  Additionally, Wilde relies on unfounded and unrepeatable assumptions that undermine his analysis. |

As discussed in more detail below, the Defendants' expert opinions: 1) irreconcilably conflict, 2) result from a series of flawed assumptions, 3) fail to admit the limitations of their methodologies, and 4) fail to consider relevant data which invalidates their opinions.

In some cases, Defendants' expert opinions are contradicted by the Defendants' statements in this case or the Defendants' positions in other cases.  For instance, Dr. Wilde opines that the Class has suffered no **<u>diminution in property value</u>** that he can measure.  <u>See</u> Exhibit C at 32.  This is not surprising since he previously offered testimony that he could not perform the calculations to discern damages to the Class.  <u>See</u> Exhibit D at Page 3, ¶ 10.  Wilde is also inconsistent with the testimony offered by the

CCC President, Kim Pan, who testified that ***all*** the $8.2 Million in damages paid by the Defendants in the "State Case" was for **diminution in property value**, and nothing else. See Exhibit E, Deposition of Kim Pan, Vol. I (Page 13:16 to 14:22).

Further conflicting with Wilde's opinions, CCC has proposed Hon. Thomas R. Brett (U.S. Dist. Judge, Ret.) to be an expert in the case of Ponca City v. CCC, CJ-2005-16 (Kay County Dist. Court, J. Page) (herein the "State Case").  Judge Brett provides the following opinions, which are revealing of CCC's knowledge of the actual facts of this case, despite the testimony they have elicited from twelve experts:

"In assessing the risks, costs and potential exposure in arriving at a reasonable settlement value I and the Continental Carbon Company and their counsel would consider the following:

1.      The likelihood the claimants would introduce evidence at trial that would create a fact question for the Trier of fact (the jury) that carbon black emissions emanating from the Continental Carbon manufacturing plant, was a proximate contributing cause of at least some of the black particulate on plaintiffs' real and personal property.  ***Photographs and samples taken supported the presence of the black particulate and also of quantities of materials consistent with carbon black.***

2.      The value of the actual damage to and associated costs of repair, replacement, cleaning, renovation or permanency of claimant's property damage or diminution in value from the black particulate.

****

4.      …   The claims posed significant risks to Continental Carbon Company for joint and several liability associated with damages for black particulate and the existence of some material consistent with carbon black. The 267 plaintiffs could be appropriately characterized as faultless.

Following the review as expressed above it is my considered opinion the decisions of Continental Carbon to settle the subject 267 claims for the total sum of $8.2 million, inclusive of plaintiffs' compensatory damage claims, costs, expenses and attorneys fees was a reasonable and prudent settlement."

See Exhibit F at 2-3 (emphasis added).   While Wilde cannot ascertain any damages, Judge Brett, Mr. Pan, CCC, CSRC, and their lawyers ultimately found reasonable an $8.2 Million value for the "actual damage" and "associated costs of repair, replacement, cleaning" and "diminution in value from the black particulate" where "Photographs and samples taken supported the presence of the black particulate" on 267 homes in the Property Class Area. [5] Id.

Defendants' thirteen experts offer opinions that are dissonant with each other and conflict with the Defendants' position in this and in other litigation.   These inconsistencies stem from the Defendants' failure to provide their experts with information that conflicts with the opinions they plan to offer, the experts' failure or disability to consider such information, and the flawed application of certain methodologies.   Additionally, because some of these persons do not possess specific expertise relating to some of the opinions they offer, or because they have stretched their conclusions beyond the limits of the science they propose to use and/or facts they were ***not*** made aware of, their opinions should be excluded or limited.

---

[5]   A map showing the locations of the 267 plaintiffs in the State Court litigation is attached as Exhibit G.  A comparison of that map to the Property Class Area certified by this Court shows that all the settled cases fall within the Property Class Area, and the locations of those properties is consistent with the entire aerial extent of the Property Class Area.  Compare Exhibits G (State Court Settling Plaintiffs) & H (Property Class Area).

## II.    AUTHORITIES

The following is a brief synopsis of the authorities Plaintiffs maintain are most relevant to this motion, along with an identification of the issues to the experts in question.  Pursuant to FRE § 702, <u>Daubert</u> and its progeny, the Trial Court's duty is to assure that proffered expert testimony is reliable and relevant to the finder of fact, and that the witness' testimony "fits" with their expertise.  Synthesizing <u>Daubert</u>, FRE 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Implicit in the FRE § 702 analysis is that the proposed testimony will be relevant, invoking FRE § 403.  <u>Daubert</u>, 509 U.S. at 587-88, 595.

"Fulfilling the gatekeeper duty requires the judge to assess the reasoning and methodology underlying the expert's opinion and determine whether it is both scientifically valid and applicable to a particular set of facts."  <u>See</u> <u>Smith & Nephew</u>, 527 F. Supp. at 1342 (<u>quoting</u> <u>Denver & Rio Grande</u>, 215 F.3d 1083 at 991).  The proponent of an expert witness's testimony has the burden of establishing its admissibility. <u>See</u> <u>Ralston v. Smith & Nephew Richards, Inc</u>., 275 F.3d 965, 970 at n. 4 (10th Cir.  2001); <u>Smith & Nephew</u>, 527 F. Supp. at 1342.  The Trial Court's decisions under FRE 703 are entitled to deference.  <u>See</u> <u>Duffee v. Murray Ohio Mfg. Co.</u>, 91 F.3d 1410, 1410-11 (10th Cir. 1996).   And, the Trial Court may decide admissibility without a hearing if it is presented with a sufficient basis for a decision.  <u>See</u> <u>United States v. Nichols</u>, 169 F.3d

1255, 1262-64 (10th Cir. 1999); United States v. Call, 129 F.3d 1402, 1405 (10th Cir. 1997).

> **A.      Some of Defendants' witness opinions do not "fit" specifically with their expertise.**

FRE 702 provides that an expert may be qualified by "knowledge, skill, experience, training, or education."  Satisfaction of one of these conditions is sufficient. See Friendship Heights Assocs. v. C. Vlastimil Koubek, 785 F.2d 1154, 1159-60 (4th Cir. 1986) (interpreting portion of FRE § 702 unchanged by Daubert and 2000 amendments). The inquiry requires that the relevant expertise "fit" or be "specific" to each opinion offered.  See Stachniak v. Hayes, 989 F.2d 914, 924-25 (7th Cir. 1993).  A court has held it appropriate to exclude the testimony of a civil engineer who never worked with, tested or studied the matters about which he intended to opine; the ability to acquire knowledge does not make one an expert.  See Silva v. American Airlines, Inc., 960 F. Supp. 528, 531 (D. Puerto Rico 1997).  Only abstract knowledge, or the ability to acquire knowledge about previously foreign subjects, like the analysis presented by Dr. Rook and Ms. Hughes, should lead to exclusion of those opinions.

> **B.      Defendants' proposed witness' opinions are not reliably grounded in sufficient facts or data and result from the unreliable application of facts, or an ignorance of the facts of this case.**

The Defendants' expert witnesses consistently did not have adequate facts at their disposal to base the opinions they have offered.  Expert testimony is unreliable if the facts on which the expert based his testimony is contradicted by the evidence.  IV Weinstein's Federal Evidence § 702.05[3] at 702-57 (Matthew Bender Supp. 2001).  Reaching conclusions without appropriate data or analysis is not an acceptable methodology.  See

Lang v. Kohl's Food Stores, Inc., 217 F.3d 919, 923-24 (7th Cir. 2000). Likewise, assuming the fact an expert is hired to prove without conducting any relevant hands on testing is also unreliable, and such an opinion should be excluded. Id. For these reasons, the opinions of the following experts ought to be excluded:

- Mrs. Hughes (who selects some data and ignores other data to provide opinions on the destruction of wastes in the thermal oxidizer, while later disagreeing with her own conclusion that thermal oxidizers combust waste better at lower temperatures, and who fails to gather any data on certain issues, other than what she is told by one or two CCC executives);

- Dr. Rook (who assumes without facts supporting his opinion that Plaintiffs' samples are contaminated and that zeolites and lanthanum are "rare" and can be used as a tracer when such is not the case); and

- Dr. Wilde (who assumes damages cannot exist, and who's opinions contradict the facts of this case).

**C.     Some of the Defendants' witness' methodologies or techniques are not reliable.**

An expert's opinions must, at least, utilize sound methods and procedures. See, e.g., United States v. Markum, 4 F.3d 891, 895-6 (10th Cir. 1993); IV Weinstein's Federal Evidence § 702.05[3] at 702-55, n. 52 (Matthew Bender Supp. 2001). At least two of the Defendants' experts have not reliably employed known methodologies (Wilde), or they have stretched their methodologies beyond their known error rate to report misleading information (Millette). Under Daubert and its progeny, there is no definitive checklist in conducting this part of the analysis, but a list of potential, non-exclusive factors can be employed:

1.     Whether the technique can be reliably tested;

2.     Whether the technique has been subjected to peer review;

3.     Whether the technique has a known or potential error rate;

4.      The general acceptance of the technique;

5.      Has the expert developed and implemented his methods solely for the purpose of testifying, or does he use the same methods in his other work?

6.      Has the expert used the same rigor in reaching his opinions that he has used outside the courtroom?

See Daubert, 509 U.S. at 592-594; Khumo Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S. Ct. 1167 (1999) (rigor); Summers v. Missouri Pac. R.R., 132 f.3d 599, 604 (10th Cir. 1998) (sound technique necessary); Daubert v. Merrell Dow Pharm., 43 F.3d 1311, 1317-19 (9th Cir. 1995) (litigation taint); IV Weinstein's Federal Evidence § 702.05[3] at 702-46 to 702-58 (Matthew Bender Supp. 2001) (generally).

## III.    PROPOSITIONS ON WHICH DEFENDANTS' EXPERTS AND OPINIONS SHOULD BE EXCLUDED

The Plaintiffs have identified below the specific factual reasons why certain of the Defendants' experts, or certain of the opinions offered ought to be excluded:

**PROPOSITION 1.  THE ENTIRETY OF DEANNE HUGHES OPINIONS OUGHT TO BE EXCLUDED BECAUSE SHE ADMITS THAT SHE IS NOT AN EXPERT IN RELATION TO MANY OF HER OPINIONS, AND WITH RESPECT TO THE OTHERS SHE HAS AN INSUFFICIENT AND INACCURATE FACTUAL BASIS FOR HER OPINIONS**

Without specifically identifying discrete opinions or conclusions, Mrs. Hughes offers numerous and wide-ranging statements in the following nine subject areas:  1) "Particulate matter emissions"[6] Exhibit I at 2-8;  2) "Repair and Replacement" Exhibit I at 7;  3) "Modeling" Exhibit I at 8;  4) "Permit related issues" Exhibit I at 8-9;  5) "Maintenance" Exhibit I at 9;  6) "Environmental Management Systems" Exhibit I at

---

[6]      The text shown in red are areas of proposed testimony where Mrs. Hughes admits that she is not an expert as discussed below.  That text shown in orange are areas of proposed testimony where Mr. Hughes did not have a sufficient or accurate factual basis for her opinions, and where known facts conflict with her assumptions.

9;  7)  "Environmental logs"  Exhibit I at 9-10;  8)   "Fugitive Emissions"  Exhibit I at 10-

11; and 9) "Compliance"  Exhibit I at 11.

**PROPOSITION 1.  THE ENTIRETY OF DEANNE HUGHES OPINIONS OUGHT TO BE EXCLUDED BECAUSE SHE ADMITS THAT SHE IS NOT AN EXPERT IN RELATION TO MANY OF HER OPINIONS, AND WITH RESPECT TO THE OTHERS SHE HAS AN INSUFFICIENT AND INACCURATE FACTUAL BASIS FOR HER OPINIONS**

Mrs. Hughes admits she is not an expert on "Maintenance" of an industrial facility and she should be precluded from testifying about such issues.  See Exhibit L, Depo Hughes V. 3 (Page 606:25 to 607:14).

Mrs. Hughes admits that she is not an expert on "Repair and Replacement" or whether certain parts of the CCC plant should have been replaced, and she should be precluded from testifying about such issues.  See Exhibit L, Depo Hughes V. 3 (Page 574:20 to 596:25).  When asked to compare her "opinions" with the careful and well documented opinions expressed by Dr. Dudley, she was unable to provide cogent or meaningful answers.  Id.; compare Exhibit M, Expert Report of Dr. Dudley at Exhibits 2 & 6 to Exhibit I, Mrs. Hughes Report at 7 (near the bottom of the page).  Indeed, Mrs. Hughes admits that she only looked at two financial reports, which contain conflicting information, and made no independent verification of the opinions she seeks to offer.  See Exhibit L, Depo Hughes V. 3 (Page 592:3 to 592:16).  Mrs. Hughes opinions on repair and replacement should be excluded.

Mrs. Hughes admits that she did not perform any "Modeling," and that she is only repeating or relying on what CCC's air modelers have found.  Id. (Page 602:4 to 604:19). Mrs. Hughes' proposed cumulative testimony ought to be excluded, particularly given

that she didn't do any of the work she seeks to opine about.  United States. v. Charley, 189 F.3d 1251, 1267 (10th Cir. 1999).

Mrs. Hughes admits that she did no independent review of CCC's various "Environmental Logs," and admits that "I don't believe I'm claiming to be an expert here."  Id. (Page 607:2 to 607:3 and 605:14 to 610:10).  Her proposed testimony is mere speculation, and ought to be excluded.

Mrs. Hughes is not an expert on "Environmental Management Systems" – "Q. Environmental Management Systems, are you an expert in it?  A.  No, other than – No." Id.  (Page 610:11 to 610:13).  Her proposed testimony ought to be excluded.

**A. Mrs. Hughes was not provided relevant data upon which to base her opinions, and as a result they are not reliably grounded in sufficient facts or data and result from the unreliable application of facts, or an ignorance of the facts of this case**

Mrs. Hughes opines in regard to "Particulate Matter Emissions," for the purpose of rebutting the emission estimates prepared by Dr. Dudley and Mr. Bolton.  To do so, Ms. Hughes relied exclusively on the 2004 stack testing done at the CCC Plant.  See Exhibit I at 4, table 1; Exhibit L, Depo Hughes V. 3 (Page 476:14 to 477:11).  At page 5 of her report she states, "Reliable particulate matter emissions have been determined at the facility through stack testing and are quantified for 2004 in the table above."  See Exhibit I at 5, ¶ 1.

Ms. Hughes agrees that "the intent of stack testing is to capture a representative picture of your emissions.  So, that's how facilities are expected to operate during a stack testing event."  Exhibit K, Depo. Hughes - V. 1 (Page 124:12 to 124:15).  She goes on to state, "DEQ relies on facilities to operate the way they normally operate when stack

testing takes -- when, when stack testing is done. … they expect the facility to operate in a representative manner." Id. (Pages 137:25 to 138:1 and 37:19 to 137:21).

However, the 2004 stack testing does not reliably estimate the emissions from the CCC plant except for the moments when the stack test was conducted. Ms. Hughes was unaware at the time of her report, and at the first day of her deposition, of the circumstances of that stack testing. One of the most important things she was unaware of is that "flow rates" reported by CCC to ODEQ and included in the stack test results are wrong. "Flow rates" are important to understand the meaning of the tests because the stack tests measure the proportion of emissions for any given "flow rate" and are to be conducted when the plant is operating within 10% of its capacity. While CCC reported to ODEQ that its flow rates were 18,630 pounds per hour during the stack tests in 2004, Mr. Choquette shows that CCC's flow rates during the stack tests were actually about 1/3 lower than what CCC told the ODEQ. See Exhibit Q, Choquette Report at pp. 8, ¶ 2. As a result of this discrepancy, there is no way to know what CCC's actual emissions were from the 2004 stack tests, and Hughes' analysis is unreliable.

Making Mrs. Hughes opinions even more unreal is that she was never made aware of the conditions of the 2004 stack testing, even though those circumstances were summarized in a memorandum from Johnnie Little, an ODEQ Engineer and the agency's lead stack tester at the 2004 CCC stack tests. See Exhibit J, ODEQ Stack 2004 Stack Test Memo; compare Exhibit K, Depo. Hughes, V. 1 at 288, l. 8 to 296, l. 12. CCC and its lawyers had this memo for at least two years prior to Mrs. Hughes' deposition, after Plaintiffs obtained and produced it in this litigation, and CCC knew of all the facts

contained in the memo as they participated in the stack testing.  Exhibit J provides the following information that Hughes was unaware of:

1.    That the initial test for thermal oxidizer No. 4 at CCC showed no excess oxygen, and high carbon monoxide.  <u>See</u> Exhibit J at pp. 2, ¶ 1.

2.    That CCC completely changed the operations of thermal oxidizer No 4 for the 2004 stack tests by adjusting the air inlet dampers and increasing air flow, by changing the air fans twice, by replacing a valve, and by adding water sprays.  <u>See</u> Exhibit J at pp.2, ¶ 3, pp. 3, ¶ 6, pp. 4. ¶¶ 2 & 4, and pp. 5, ¶¶ 1 & 2.

3.    The purpose of these changes was to "**<u>lower the flame height</u>** and reduce cyclonic flow."  <u>See</u> Exhibit J at pp. 2, ¶ 3.

4.    That there were "significant deviations" in the 2004 stack test from the normal protocols:  1)  no pictures were taken of the sample containers to show that tampering had not occurred, 2) CCC refused to give ODEQ copies of the original data sheets, and 3) CCC's summary of results data – the data on which Hughes relies – "does not provide an accurate reflection of the actual emissions of PM (particulate matter) from the Facility stacks."  <u>Id</u>. at pp. 5, ¶ 7 to pp. 6, ¶ 1.

In addition, Mrs. Hughes was unaware that:

1.    Mr. Luton, the longtime CCC plant manager instructed his workers that "ANYTIME there is a discernable flame on the exit stack of the TO's [thermal oxidizers] you likely have a bag filter leak."   <u>See</u> Exhibit N (emphasis in original).

2. Terry Simmerson, the current Safety Health and Environmental Affairs (SHEA) director for the Ponca Plant testified that in his year-plus-long experience at the plant, he always sees a flame at the top of the thermal oxidizers when they are operating. See Depo. Simmerson (Page 155:1 to 155:11). Jim Bishop, a former SHEA manager at the Ponca Plant testified that he likewise always saw flames on the thermal oxidiers when he was there. See Exhibit DD, Depo. Bishop (Page 174:16 to 176:7).

3. Gerald McClosky, the engineer who actually conducted the 2004 stack tests testified that he did not see flames shooting out of the tops of the thermal oxidizers when stack testing was occurring. See Exhibit O, Depo. McCloskey (Page 80:13 to 81:1). Though, he did see "candle flames" on the thermal oxidizers at night, and attributed them to glowing refractory. Id. (Page 82:1 to 83:13).[7]

See Exhibit R, Hughes Depo. V. I (Page 225:4 to 227:9).

Plaintiffs have captured night-time photos of the flames from the thermal oxidizers. See Exhibit M (Dudley Report) at Exhibit 8, e.g., pages 18 to 28. Anyone who looks can see the flames leaping into the night sky.

> "Operation of the TOs without excess oxygen in the stack exhaust can result in a visible flame at the top of the stack, excess CO emissions, excess PM emissions and the generation of soot from the incomplete combustion of the waste gases."

See Exhibit M, Dr. Dudley Report at Exhibit 5. P3, ¶ 2 (letter report of Mr. LeBlanc).

---

[7] To be fair with Mrs. Hughes, McCloskey's deposition was taken after her report, and even after her deposition. However, she knew he conducted the stack testing by reading the reports that he signed. His firm is a well known stack testing company. She easily could have spoken with him.

From known facts identified above (Luton, Simerson, Bishop and McCloskey), CCC routinely operates its thermal oxidizers and other equipment so as to cause flames to occur on the top of the stacks.  However, the same conditions were not present during the times that the 2004 stack testing was actually conducted, except the times that the flame was too high, CO concentrations were very high, and there was no excess oxygen.  Those conditions were changed before further stack testing occurred.  See Exhibit J.

Mrs. Hughes testified that the destruction efficiency of the thermal oxidizers is "not germane to the issue of whether Bolton and Dudley did their calculations correctly." But, in fact it is.  As Mr. Choquette -  COP's expert – points out, the thermal oxidizers are not intended to incinerate carbon black particles.  See Exhibit Q, Choquette Report at pp. 8, ¶ 3.  Mr. Hayes (another of CCC's experts) provides a conservative assumption that bag filter leaks can cause up to 900 pounds per hour of carbon black to be released to the thermal oxidizers.  (Recollection of counsel – to be supplemented when a transcript is available).  Mr. Choquette, COP's expert, estimates bag filter leaks known to occur at CCC as causing 372 pounds per hour of carbon black to be released to the thermal oxidizer, and then the environment.  See Exhibit Q, Choquette Report at pp. 8, ¶ 3.  Mr. Schutz, an ODEQ permit engineer with knowledge of the Ponca Plant estimates that at their maximum, the exhaust bag filters (one of a variety at the plant) could emit up to 1,000 pounds per hour to the environment.  Id.

CCC has been aware of massive bag filter leaks at the Ponca Plant for nearly two decades.  Dr. Wainsborough, a long time consulting engineer for CCC found in 1993 that the company was leaking between $500 and $1,500 a day of carbon black from some of its bag filters, to the thermal oxidizers.   See Exhibit S at 2, ¶ 4.  As Dr. Wansbrough

points out, "Either all the carbon black will disappear, or all the oxygen will."  Id. at ¶ 1. In 1994 all the oxygen disappeared.  See Exhibit J.  Which, as Dr. Dudley and Mr. Leblanc point out will cause "excess PM emissions and the generation of soot from the incomplete combustion of the waste gases."  See Exhibit M, Dr. Dudley Report at Exhibit 5. P3, ¶ 2 (letter report of Mr. LeBlanc).

### B.      Hughes misunderstands the nature of the what fugitive emissions are, a large part of the emission estimation she was asked to perform

Further, Hughes misunderstands what "fugitive emissions" are.  Hughes defines "truly fugitive emissions" as "those originating from spilled material being blown."  See Exhibit I at p. 4, n 4 and at p. 10, ¶ 2.   However, "Fugitive Emissions" are defined as "those emissions which could not reasonably pass through a stack, chimney, vent, or other functionally equivalent opening."  See 252 OAC § 100-1-3 (Definitions).  These regulatory definitions are engineering definitions, much more than they are legal terms. That Hughes would not know this rudimentary information undercuts her expertise.

Her faulty definition also allows her to ignore significant fugitive emissions, for instance, as internal CCC documents and other sources show:

1.   **Dryer drums** (see Exhibit M, Dudley Report, Exhibit 2 at p. 32, photo no. 49; Exhibit M, Exhibit 6 at p. 26.)  (Compare Exhibit T, Capital Project Review at Bates PON00113696C: "Seal failure causes:  … waste gas entrained with carbon black blows  [sic] into atmosphere. **Hot gasses float high into atmosphere making emissions onto neighboring houses highly probable**.");

2.   **Bag houses** (see Exhibit M, Dudley Report, Exhibit 2 at p. 9 to 30.) (Compare Exhibit T-1, 2004 Capital Project Review at Bates PON30000612C and 14C: "Metal from cones to top of filter severely corroded … New holes forming continuously … **Severe leaks coupled with height of filter lead to high probability for emissions to reach neighboring homes.**").

Such fugitive emissions –those from leaks throughout the Ponca Plant – are a part of the particulate matter emitted from the Ponca Plant.  In 2004 CCC was cited at least twice by the ODEQ, which found in its conclusions of law that the Defendants caused fugitive emissions which in turn caused air pollution, evidenced by the many complaints and other facts recorded by the ODEQ in its official documents.  See Exhibits U & V.

Hughes simply finds there are no fugitive emissions from the Ponca Plant.  See Exhibit I at p. 4, table 1.  She states, "Exhaust from the main bag filters is routed to the thermal oxidizer stack, and at #4 to the waste gas combustor for the dryer as well.  Any remaining particulate is combusted in either the thermal oxidizer or the waste gas combustor.  There are no permitted emission rates from the MBF **because the exhaust from these units is controlled**."  See Exhibit I at p. 11, ¶ 1.  Her opinions about emission estimates and fugitive emissions are not based reliably on the facts known in the case and should be excluded.

**PROPOSITION 2.  SOME OF THE OPINIONS OF DR. HARRY ROOK OUGHT TO BE EXCLUDED INSOFAR AS THEY ARE WITHOUT ANY FACTUAL BASIS AND ACTUALLY CONTRADICT A CAREFUL STATISTICAL ANAYSIS OF THE DATA HE RELIED UPON**

Dr. Rook opines in his report that "The samples collected by Ms. Treanor were not collected following the required procedures given in ASTM Standard D6602-03 … The use of composited samples is **not permitted** by ASTM Standard D6603 and will preclude assessing the presence of carbon black at any individual location."  See Exhibit W, Dr. Rook Report at 5, ¶ 1.  When questioned about these statements and a prior draft report where he used the term "**not recommended**" instead of "**not permitted**," regarding composite sampling, Dr. Rook recanted and indicated that it was just different wording.  See Exhibit Y, Rook Depo. (Page 168:21 to 172:3).

The ASTM Standard for carbon black identification does not prohibit or espouse the use of composite sampling. See Exhibit X (no specific page and para. identified, because its not there). Instead, ASTM has published a standard for composite sampling, of which Dr. Rook denied any familiarity. See Exhibit Y, Rook Depo. (Page 172:4 to 172:14.); compare Ex Z, ASTM 6051-96, Standard Guide for Composite Sampling and Field Subsampling for Environmental Waste Management Activities. Dr. Rook's opinion that composite sampling is not allowed clearly falls outside any area of his expertise. He has recanted the statement in his report, and he should not be permitted to testify about this matter.

Dr. Rook stretches his opinions beyond reality when he makes the following statement:

> It is my opinion that either the samples collected by Ms. Treanor for Tetra Tech Inc. were severely contaminated with carbon black during the sampling process or, more likely, that the samples were intentionally adulterated with carbon black to give a false, high representation of the level of carbon black at the sampling sites. In either case, the samples collected by Ms. Treanor and analyzed by Dr. Garth Freeman are scientifically unreliable in attempting to determine the level of carbon black present in environmental samples in and around Ponca City.

See Exhibit W, Dr. Rook Report at 5, ¶ 4.

When questioned about this "opinion" and asked if he had any evidence on the issue, he reported that he did not. See Exhibit Y, Rook Depo. (Page 177:20 to 183:20). He admitted that other samplers and testers found carbon black at many of these same locations over time. See Exhibit Y, Rook Depo. (Page 181:10 to 181:21.). In deposition, he denied that Ms. Treanor adulterated the samples. See Exhibit Y, Rook Depo. (Page 178:1 to 178:7) "I do not believe – I have no knowledge that Miss Treanor had any intent or hand in adulterating the samples. I believe she is a sampler. Q. Well,

who do you think did it then?  A.  I have no knowledge of that."  Id.  Rook's speculation ought to be excluded from the Jury.

Despite the speculative nature of his testimony, Rook attempts to find footing for his opinion in a statistical review.  See Exhibit Y, Rook Depo. (Page 108:1 to 108:6).  To understand whether that was possible, Plaintiffs engaged the assistance of Dr. Fisher.  As Dr. Fisher points out, Dr. Rook does not and cannot provide a statistically adequate basis to assert that the analytical results obtained for Plaintiff's experts' samples reflect contamination by or adulteration with carbon black.  See Exhibit AA, Report of Dr. Fisher at 4-7.  Dr. Rook admits that if presented with another data set of samples having a high frequency of soot and carbon black detections, it would influence his conclusions.  See Exhibit Y, Rook Depo. (Page 189:5 to 190:14).  As Dr. Fisher points out, such sample sets of data taken by the Defendants' experts may have been available to Dr. Rook.  See Exhibit AA, Report of Dr. Fisher at 6, ¶ 2 (footnotes omitted):

> [T]he numerically comparable data set within Sampling Period 2 is for 19 samples collected on August 27, 2004.    Of these 19 samples, a total of 18 contained soot (95 %), and 14 of the 19 samples (74%) were found to contain carbon black.  The August 27, 2004 sample set contains more than 18 samples, and has a very high frequency of both soot and carbon black detections.

As Dr. Fisher also points out, there is no way to make the statistical comparison Dr. Rook seeks to make, and in any event, he did not perform such an analysis.  Id.  Dr. Rook's "opinion" in this regard is also speculation, and should be excluded.

Finally, Dr. Rook makes a great deal of zeolites and lanthanum as a marker, or tracer, for COP catalyst, and Dr. Millette use that "finding" as the basis for their shared opinion that most of the sooty material in the Property Class Area came from the COP refinery.  See Exhibit W, Dr. Rook Report at p. 6, ¶ 5 to p. 7, ¶ 1; Exhibit B, Millette

Report at Page 8, ¶ 27 to Page 9, ¶ 31.  However, zeolites and lanthanum are **not** rare in the earth's crust.  See Exhibit AA, Report of Dr. Fisher at 8 to 10.  As Dr. Fisher points out, zeolites are used commonly for such things as animal feeds and pet litter.  Id. at 10.  Likewise, Lanthanum is not very rare in earth crustal material, and is widely used in a number of consumer products.  Id. at 8-9.

Dr. Rook is stretched beyond his expertise on this point.  Given the relative abundance of these two items, they cannot be used as tracer as Dr. Rook suggests.  Id. at 9.  Dr. Rook's opinions are not just faulty, they run counter to well established scientific facts, and are obvious flaws to a scientist trained in the discipline he seeks to opine about.  See Exhibit AA, Report of Dr. Fisher at 8 to 10.   According, Dr. Rook's opinions that a tracer can be deduced to place responsibility with COP should be excluded.

Finally, "expert testimony which does nothing but vouch for the credibility of another witness … does not 'assist the trier of fact' as required by Rule 702."  United States. v. Charley, 189 F.3d 1251, 1267 (10th Cir. 1999).  It is not unfair to characterize the largest part of Dr. Rook's analysis as vouching for the reliability of Millette and Alexander.  Under Charley, Dr. Rook's opinions would be fairly excluded.

**PROPOSITION 3.   THE OPINIONS OF DR. MILLETTE OUGHT TO BE EXCLUDED INSOFAR AS HE PROVIDES QUANTATIVE OR "SEMI-QUANTATIVE" RESULTS THAT CANNOT BE RELIABLY OBTAINED FROM THE ANALYTICAL TECHNIQUES HE PERFORMED**

Pursuant to Daubert, when an expert proposes testimony not based on knowledge and experience, but on testing and data analysis, he must know his error rate, and it musn't be too great.  Dr. Millette does not actually know his error rate, but believes it to be about 30%.  Compounding his flawed analysis, Dr. Millette is only now writing a quality assurance plan relative to the work he has done in this case.  His analysis fails not

just for having an uncertain but high error rate, it also fails because this is not the kind of work that his lab routinely does – evidenced by the fact that he has no quality assurance plan.

Dr. Millette seeks to provide results of his analyses that are far beyond the accuracy and reliability of the methods he employs. He reports his findings to a single percentange point of accuracy. See Exhibit CC data tables from Dr. Millette's work. Dr. Rook opines that the techniques Dr. Millette used are not sensitive enough to allow an analyst to report discrete percentages. See Exhibit Y, Rook Depo. (Page 120:17 to 121:18). Dr. Rook stated:

> What I'm saying is using the techniques that Jim Millette used, that Garth Freeman used, and R.J. Lee used, you cannot quantify carbon black better than trace or none, zero to ten, ten to 30 and 30 to a hundred, because the technique is not capable of that type of quantitation.

Id. at Page 120:21-121:1. In fact, Dr. Rook testified that the emissions from the Ponca Plant were between 30 and 100% carbon black. Id. at page 121.

The Plaintiffs agree with Dr. Rook that Dr. Millette's results are qualitative. They also agree that the methods used by Defendants cannot tell exactly what the Ponca Plant's emissions are. That is why Dr. Freeman reported only the presence or absence of materials that were known to have been emitted from the Ponca Plant, noting qualitatively if that material was a "major amount" of any given sample. See Exhibit A. Plaintiffs also believe that Dr. Millette ought to be permitted to testify about his observations of material consistent with the emissions from the Ponca Plant, if his analysis permits it. But Millette's testimony about discrete percentages of carbon black versus other substances (including soot, and carbon black is just a form of soot) is

misleading and stretches beyond the methodology he has used given the qualitative, not quantative, nature of the measure he employs.

This is all the more necessary because Dr. Millette estimates that his protocol has at least a 30% error rate.  <u>See</u> Exhibit BB, Dr. Millette Depo. V. 2 (Page 496:7 to 502:2). And, when pressed on the issue, Dr. Millette admitted that he has not yet quantified the relative rate of error or the quality control manual for the work he and his analysts performed.  <u>Id</u>. at 501:20 to 502:3.  Millette admits that in his reports some results could be reported as zero, while another analyst in his lab would report that the same sample had carbon black present at a trace amount – **up to 1% by volume.**  <u>Id</u>. at 503:1 to 503:12.  1% or less carbon black by volume is very important, as discussed below.

Dr. Millette opines that "The key question when examining environmental samples for carbon black in connection with darkening agents [is] whether there is sufficient carbon black present to cause the darkening."  See Exhibit FF, Millette Depo. V. 1 (Page 32:12 to 32:15).  Dr. Millette also opines in terms of what particles will cause darkening, but he is not proposed as an expert on darkening of substances in this case by CCC.  Instead, Mr. Joseph is proposed to testify about the relative darkening ability of various substances.  <u>See</u> Exhibit GG, Joseph Report at  8.  Dr. Joseph reports that as little as 0.05% of carbon black **by weight** will darken a surface.  <u>Id</u>.  Dr. Millette reports that about 1% **by volume** of carbon black will darken a surface, changing his testimony from his previous estimate that 5% by volume was necessary to darken a surface.  <u>See</u> Exhibit FF Millette Depo. V. 1 (Page 32:18 to 36:22).  Dr. Rook maintains 5% of carbon black by volume is excessive and will cause darkening.  <u>See</u> Exhibit AA at 11.

Weight (mass) and volume are related by a substance's density.  Converting Dr. Joseph's weights to volumes using the density of carbon reveals that approximately 0.1% of carbon black or soot (by volume) is what Dr. Joseph finds will darken a surface.  See Exhibit AA at 11-12.  Dr. Fisher confirms that finding.  He estimates the density of carbon black to be similar to amorphous carbon (approximately 2).  Applying Mr. Joseph's findings, about 0.1% by volume of carbon black or soot will darken a surface. Id.  That is just 10% of what Millette said would be a "trace" about 1% - and 1/50[th] of Dr. Millette's long time belief in this case.  This extraordinarily low level is where he admits significant uncertainty in his analysis.

From looking under a microscope in Georgia, Dr. Millette opines on what is dark on a surface and what is not in Ponca City.  There is no methodology for performing that analysis.  Insofar as Dr. Millette or Dr. Rook report that 1% or 5% by volume is necessary to darken a surface, their fellow expert, Mr. Joseph, has proved them wrong. Dr. Millette's and Dr. Rook's estimates of the volume of material that will cause darkening should be excluded; they are supposition, and they are proved wrong by Mr. Joseph and Dr. Fisher.

**PROPOSITION 4.  THE OPINIONS OF DR. WILDE RELATING TO HEDONIC REGRSSION ANALYSIS OUGHT TO BE EXCLUDED BECAUSE HE PREVIOUSLY ADMITTED THAT HE COULD NOT CONDUCT SUCH AN ANALYSIS AND WHENCE HE ATTEMPTED TO HIS APPLICATION OF STANDARD METHODS IS "MEANINGLESS."**

As pointed out to start this brief, Dr. Wilde first opined that no analysis could be performed to calculate class-wide damages, when he offered his opinion in opposition to the class in 2006.  See Exhibit D.  His conclusions are also directly at odds with CCC President Pan's opinions (Mr. Pan is a graduate of the Wharton School) that all damages

to non-Indians throughout the Class were for diminution in property value.  Certainly Dr. Wilde's ignorance of these facts undermines the veracity of his testimony, but it does more than that. Defendants position on the matter of damages cuts through Wilde's own opinion, and makes it unreliable, untrustworthy, and properly excluded.

There are additional methodological errors in Dr. Wilde's work that make his opinions unreliable.  The most important of those flaws is Dr. Wilde's arbitrary and incomplete selection of "areas" or "zones" for which to test for diminution in property value from the Ponca Plant and the COP Plant.

Dr. Wilde selects two "zones" – a COP Zone and a CCC Zone – and attempts to combine and separate them based on where complaints were made to the ODEQ.  See Exhibit DD at PON70000905-6.   However, his zones do not encompass all the complaints.  When asked why, he said that he decided not to include "outliers."  But he agreed that he did no statistical analysis to determine whether the points he excluded were outliers or not.  See Exhibit EE, Dr. Wilde Depo. (Page 266:9 to 268:19).  When asked about the data points he used to define his zones, Wilde acknowledged that if the zones were stretched to encompass all the data points, it would "change the results dramatically" and his analysis would "just become meaningless."  Id. at 269:20 to 271:8.  Indeed, Wilde ignored the data that didn't yield the results he wished for in an arbitrary, irreproducible and un-testable way.  His testimony about damages to the Class is "meaningless" and should be excluded.

## CONCLUSION

For the reasons stated herein, some or all of the opinions of Mrs. Hughes, Dr. Rook, Dr. Millette and Dr. Wilde ought to be excluded from presentation to the Jury.

Respectfully submitted this Monday, June 16, 2008,

Kalyn Cherie Free, OBA No. 12298
406 S. Boulder Ave., Mezz.
Tulsa, Oklahoma 74103
Telephone: (918) 583-6100
Facsimile: (918) 583-6104
kfree@cwis.net


__/s/  Jason B. Aamodt, Esq._____.
Jason B. Aamodt, OBA No. 16974
Wilfred K. Wright, OBA No. 16349
AAMODT &WRIGHT, PC
401 S. Boston Avenue, Suite 1717
Tulsa, Oklahoma 74102
Telephone: (918) 347-6169
Facsimile: (918) 398-0514
jason@awlex.com
wkw@awlex.com

Lon Walters, OBA No. 21919
Christin DiMartino, MBA No. 58068
THE WALTERS LAW FIRM, LLC
105 E. 5th Street
Oldham Building, Suite 401
Kansas City, Missouri 64106
Phone: (816) 472-1400
Fax: (816) 472-4433
lwalters@walterslaw.com
cdimartino@walterslaw.com

R. Casey Cooper, OBA No. 1897
Christopher K. Woosley, OBA No. 16348
Andrea Stailey, OBA No. 20851
COOPER McKINNEY & WOOSLEY
401 S. Boston Ave., Suite 3300
Tulsa, Oklahoma 74103
Telephone: (918) 592-3300
Facsimile: (918) 592-7816
casey.cooper@cmw-law.com
chris.woosley@cmw-law.com

**ATTORNEYS FOR PLAINTIFFS**