## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

THE PONCA INDIAN TRIBE OF
OKLAHOMA, et al.,

       Plaintiffs,

  vs.

CONTINENTAL CARBON
COMPANY, CCC USA CORP., and
CHINA SYNTHETIC RUBBER CORP.,

       Defendants,

And                            Case No. CIV-05-445-C

CONTINENTAL CARBON COMPANY
and CCC USA CORP.,

       Third-Party Plaintiffs,

  vs.

CONOCOPHILLIPS, a Corporation,

       Third-Party Defendant.

## CONTINENTAL CARBON COMPANY'S RESPONSE IN OPPOSITION TO PLAINTIFFS' AND CONOCOPHILLIPS' MOTIONS TO EXCLUDE THE <u>EXPERT TESTIMONY OF JAMES MILLETTE</u>

Defendants Continental Carbon Company and CCC USA Corp. (collectively, "CCC") submit this Response in Opposition to Plaintiffs' and ConocoPhillips' Motions to Exclude the Expert Testimony of James Millette.[1]  Dr. Millette's proposed testimony is relevant and reliable and should be admitted in its entirety.

## INTRODUCTION

Dr. James Millette intends to provide expert opinions regarding the contributions of CCC's facility and COP's refinery to the dark-looking material deposited on surfaces in various locations in the Ponca City area.  *See* Expert Report of James R. Millette, Ph.D. ("Millette Rep.," Exh. 1 hereto) ¶ 1.  His opinions are based on a meticulous forensic microscopy analysis of about 350 environmental samples collected at properties in and near Ponca City over a number of years, as well as his review of documentary and video evidence and his more than 30 years of professional experience in testing and identifying environmental particulate using microscopic techniques.  *Id*. ¶¶ 1-2, 18.

Neither Plaintiffs nor COP disputes the relevance of Dr. Millette's testimony to Plaintiffs' property damage claims.  Among other things, Dr. Millette has formed opinions regarding the approximate percentages of different types of particles found in the Ponca City-area samples he analyzed, including the approximate amount of material

---

[1] On June 16, 2008, Plaintiffs moved to exclude portions of CCC's proposed expert testimony, including portions of the testimony of Dr. James Millette.  *See* Plaintiffs' *Daubert* Motion and Brief in Support ("Pls.' Mot.," Doc. 395).  On the same day, Third-Party Defendant ConocoPhillips ("COP") also moved to exclude portions of Dr. Millette's proposed testimony.  *See* Third-Party Defendant ConocoPhillips' Motion to Exclude the Expert Report and Testimony of James Millette ("COP Mot.," Doc. 388).  In the interests of efficiency and economy, CCC submits this combined response in opposition to COP's motion and to the portion of Plaintiffs' *Daubert* motion directed at Dr. Millette's testimony.

consistent with carbon black.  *Id*. ¶ 12; *see also* Millette data tables (Exh. 2 hereto).  He opines that particles produced and emitted by the COP refinery, including soot, coke, and sooty catalyst, contribute to darkening in many of the samples, and that some of the soot emitted by COP cannot be distinguished from carbon black manufactured by CCC. Millette Rep. ¶¶ 19, 24.  Dr. Millette has concluded that the COP refinery is the source of the majority of industrial emissions that cause darkening in the Ponca City area.  *Id*. ¶ 37.

Dr. Millette's qualifications to perform the microscopic analysis underlying these opinions are indisputable.  He is an expert microscopist with more than 30 years of experience in testing and identifying particulate in environmental dusts using microscopic techniques.  *Id*. ¶ 2 & App. A.  Dr. Millette is experienced in differentiating carbon black from other environmental particulates using the methodology he employed in this case, ASTM International's Standard D-6602-3b, "Standard Practice for Sampling and Testing of Possible Carbon Black Fugitive Emissions or Other Environmental Particulate, or Both."  *Id*.  He holds many professional affiliations and honors and has authored numerous publications in scientific journals.  *Id*.  In particular, Dr. Millette has published on the analysis of dark agents in environmental samples in peer-reviewed scientific literature[2] and has received an award from the American Academy of Forensic Scientists for his work in developing methods in the Environmental Forensics Microscopy field.[3]

---

[2] *E.g*., James R. Millette, et al., *Microscopic Investigation of Outdoor "Sooty" Surface Problems*, Environmental Forensics 8:37-51 (2007); James R. Millette, et al., *Sizing Nano-Range Primary Particles in Aciniform Carbon Aggregates Using ImageJ*, Microscope, vol. 54:2, pp. 51-59 (2006) (both in Exh. 3 hereto).

[3] American Academy of Forensic Scientists (AAFS) Engineering Sciences Section's Andrew H. Payne, Jr., Special Achievement Award, Feb. 20, 2008.

He has provided expert testimony on microscopial analysis issues in numerous cases. Millette Rep. App. B.

Despite Dr. Millette's unassailable expertise, Plaintiffs and COP argue that the results of his forensic microscopy analysis are unreliable and should be excluded under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). They do not directly challenge the globally recognized, ASTM method Dr. Millette followed in conducting his analysis. Instead, they attempt to argue that Dr. Millette reported his results in a way that is not supported by this methodology. However, the ASTM standard plainly sets forth a procedure to do exactly what Dr. Millette has done in this case: estimate percentages of carbon black and other components contained in samples. Plaintiffs' and COP's additional complaints regarding the known error rate of Dr. Millette's visual estimation methodology, and Plaintiffs' misleading assertion regarding his supposed lack of a "quality assurance plan," are not bases for exclusion of his opinions under Rule 702, but rather, are factors to be weighed by the jury in assessing this testimony. Plaintiffs' incorrect contention that one of Dr. Millette's opinions is "proved wrong" by another of CCC's experts is nothing more than an attempt to distract the Court and provides no basis for exclusion of any of Dr. Millette's testimony.

In addition, COP would like the Court to exclude Dr. Millette's opinion that sooty catalyst particles emitted by COP's refinery are a darkening agent. COP's desire to prevent the jury from hearing this opinion is understandable, but its argument that the opinion is mere litigation-driven speculation is unavailing. Dr. Millette's testimony

3

regarding sooty catalyst is demonstrably reliable and supported by his observations and analysis of samples in this case.

## ARGUMENT AND AUTHORITIES

**A.      Dr. Millette's Forensic Microscopy Analysis Is Reliable.**

**1.      Dr. Millette's visual estimates of the percentages of components contained in samples are based on a reliable ASTM methodology, which he followed.**

Dr. Millette followed ASTM Standard D-6602-3b, "Standard Practice for Sampling and Testing of Possible Carbon Black Fugitive Emissions or Other Environmental Particulate, or Both," to analyze the Ponca City-area samples using light and electron microscopy.[4]   This method is a globally recognized consensus standard authored by ASTM International, the nation's leading voluntary standards development organization.[5]   Courts recognize adoption of a methodology by ASTM as indication of reliability under *Daubert*.[6]   Another of CCC's expert witnesses, Dr. Harry Rook, has concluded based on his research and experience that ASTM Standard D-6602-3b is "the

---

[4] Millette Rep. ¶ 3.  A complete copy of ASTM Standard D-6602-3b (hereinafter, the "ASTM Standard") is attached as Exhibit 4 hereto.

[5] *See* Expert Report of Harry L. Rook ("Rook Rep.," Exh. 5 hereto) at 3. Specifically, this standard falls under the jurisdiction of ASTM Committee D24 on Carbon Black.  ASTM Standard at n1.  Dr. Millette is a member of this committee. Millette Rep. App. A.

[6] *See Robinson v. Hartzell Propeller Inc.*, No. 01-5240, 2007 WL 2571447, at *6 (E.D. Pa. Aug. 30, 2007) (holding expert's use of ASTM standard was a reliable methodology and recognizing that ASTM methods reflect general acceptance in experts' fields, citing supporting cases); *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 978 (M.D. Tenn. 2002) (expert's failure to comply with ASTM standards, despite his understanding of their "authoritative nature," belies his claim that his theories are generally accepted); *Milanowicz v. Raymond Corp.*, 148 F. Supp. 2d 525, 533 (D.N.J. 2001) (courts should examine, as part of their reliability analysis, whether an expert has referenced standards published by independent standards organizations such as ASTM).

recognized standard of choice worldwide for the identification and quantitative analysis of carbon black in particulate matter."[7]   Rook Rep. at 4.   Plaintiffs' and COP's own experts, Drs. Garth Freeman and Richard J. Lee, both claim to have employed procedures outlined in ASTM Standard D-6602-3b in their analyses for this case.[8]   Like all ASTM standards, it has undergone testing for reproducibility and representativeness.   Deposition of James R. Millette, Ph.D. ("Millette Dep.," Exh. 8 hereto) at 489.

ASTM Standard D-6602-3b contains a "mandatory" section, Section 7, which prescribes procedures for determining particles consistent with carbon black among other aciniform soot particles in a sample, using a transmission electron microscope ("TEM"). This section is referred to as "mandatory" because it must be followed in order for an analyst to report that he used the standard.[9]   Using a TEM equipped with an energy dispersive spectroscopy ("EDS") x-ray analysis system (this equipment is described in Section 7.4.3 of the standard), Dr. Millette and microscopists working under his direction followed the procedures in Section 7 to classify the aciniform soot particles in each sample as consistent or inconsistent with carbon black.   Millette Rep. ¶¶ 11-12; Millette Dep. at 41.   Neither Plaintiffs nor COP appears to take issue with this component of Dr. Millette's analysis.

---

[7] Rook Rep. at 4.   Dr. Rook is an expert in environmental and material standards, and his expert report provides useful background on ASTM standards generally, and ASTM Standard D-6602-3b specifically.   *See* Rook Rep. at 3-4.

[8] *See* Expert Report of Garth B. Freeman, Ph.D. (Feb. 29, 2008) ("Freeman Rep.," Exh. 6 hereto) at 2-3; Expert Report of Dr. Richard J. Lee (Apr. 14, 2008) ("Lee Rep.," Exh. 7 hereto) at 3.

[9] *See* Deposition of Harry Rook, Ph.D. (May 14, 2008) ("Rook Dep.," Exh. 9 hereto) at 54.

To supplement the mandatory TEM procedures, Section 8 of the ASTM standard sets forth several ancillary methods which are *recommended* for more detailed analyses of particulate samples, depending on the needs of a particular project.  ASTM Standard §§ 7.1.1 ("In addition to TEM examination, the ancillary methods in accordance with Section 8 may provide supporting information as to the nature and amount of the material"); 8.1 (explaining that the ancillary techniques described in Section 8 "can provide critical supporting, sometimes 'fingerprinting,' information that is useful in identification").[10]  Dr. Millette augmented his analysis by following a recommended ancillary technique set forth in Section 8.3: he used a polarized light microscope ("PLM") to make semi-quantitative visual estimates of the components of various types of particulate matter composing each sample.  Millette Rep. ¶¶ 11-12; Millette Dep. at 13.

Plaintiffs and COP take issue with the way in which Dr. Millette reported his semi-quantitative estimates in his data tables.  They argue that by reporting his results as approximate percentages, Dr. Millette did not follow, or went "beyond," the method set forth in the ASTM standard.  Pls.' Mot. at 29; COP Mot. at 4-5.  This proposition is flatly contradicted by the plain text of Section 8.3, which requires the microscopist using the PLM to "*Estimate the percentage of each component from Table 3 and record.*"[11]  This is

---

[10] *See also* Rook Dep. at 54 (explaining that supplementary techniques in ASTM Standard D-6602-3b should be followed if additional information is desired).

[11] ASTM Standard § 8.3.3.4 (emphasis added).  Table 3 lists common particulates in environmental samples, such as pollen, rubber dust, mold, and particulate carbon.  The "particulate carbon" heading includes carbon black in parenthesis.

exactly what Dr. Millette did.[12]   For each type of particulate found in a sample, Dr.

Millette used the PLM to estimate a percentage range for the amount of each type of

particulate present in the sample pursuant to Section 8.3, and then, using the mandatory

Section 7 TEM, determined and recorded an approximate percentage value for the

amount of material consistent with carbon black.  Millette Dep. at 54 ("that is to give an

estimate of what the material is.  It's a semi-quantitative value of how much is there.").

The wavy tilde ("~") symbol in front of each of the values Dr. Millette listed under the

"consistent with carbon black" column denotes that the value is approximate and not

specific.[13]

COP suggests that the fact that Dr. Millette's semi-quantitative values are "visual

estimates," alone, casts aspersions on their reliability.  COP Mot. at 4.  Because Dr.

Millette followed the procedures set forth in Section 8.3 of the ASTM standard, this

amounts to an attack on the reliability of the ASTM standard itself, which the Court

should reject, given the widespread recognition of the reliability of ASTM

[12] *See* Exh. 2 (Millette data tables).  Dr. Millette is the *only* expert in this case who has made these types of estimates, and it is important for the jury to hear this testimony.

[13] In an attempt to confuse matters, Plaintiffs mischaracterize Dr. Rook's deposition testimony as evidencing a belief that Dr. Millette's microscopic analysis results are "qualitative."  Pls. Mot. at 29.  On the contrary, Dr. Rook agrees with Dr. Millette that the ASTM method is semi-quantitative, Rook Dep. at 191, and in Dr. Rook's expert opinion, Dr. Millette's reported results "give a scientifically reliable estimate of particle size and description of the airborne particulate matter on the surfaces from which they were collected."  Rook Rep. at 6.  Dr. Rook's opinion is that several types of ranges or estimations may be used in reporting semi-quantitative results.  *See* Rook Dep. at 122 (commenting on semi-quantitative results reported by another microscopist).  The passage of Dr. Rook's deposition testimony quoted by Plaintiffs and COP provides an example of the type of percentage ranges that may be used in semi-quantitative analysis. Pls.' Mot. at 29; COP Mot. at 4.

7

methodologies. *See, e.g.*, *Robinson*, 2007 WL 2571447, at \*6. Moreover, the semi-quantitative visual estimate of percentages of particles in samples is a well-known technique that has been used for many years by geologists,[14] paleontologists,[15] and asbestos analysts.[16] The use of the technique for outdoor samples is described in *The Particle Atlas*, published in 1979.[17] Such recognition in scientific literature further underscores the reliability of this technique. *See Daubert*, 509 U.S. at 593 (whether a technique has been subjected to peer review and publication is a factor indicating scientific validity; "submission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected").

> **2.     Dr. Millette's known error rate and his laboratory's quality assurance plan implicate the weight, not the admissibility, of his testimony.**

Plaintiffs and COP also argue that Dr. Millette's semi-quantitative percentage estimates of particulates should be excluded based on the *known* error rate of his visual estimation methodology. Pls.' Mot. at 28-29; COP Mot. at 4-5. They offer no legal

---

[14] Russell B. Travis, *Classification of Rocks*, Quarterly of the Colorado School of Mines, vol. 50, n. 1 (1955) at 8; Jeffrey C. Reid, *Comparison chart for estimating volume percentages of constituents in rocks and concentrates in the range of 1.0 to 0.1 volume percent*, American Mineralogist, vol. 70 (1985) at 1318-19 (both in Exh. 10 hereto).

[15] Baccelle, L., & Bosellini, A., *Diagrammi per la stima visiva della composizione percentuale nelle rocce sedimentarie*, 1 Ann. Univ. Ferrara, N. Ser., Sez. IX, Sci. Geol. Paleontol. (1965) at 62 (in Exh. 10 hereto).

[16] Walter C. McCrone, *The Asbestos Particle Atlas* (Ann Arbor Science Publishers, Inc., Ann Arbor, Mich., 1980) at 56 (in Exh. 10 hereto).

[17] Skip Palenik, *The Particle Atlas*, 2d ed., vol. V, p. 1367 (Ann Arbor Science Publishers, Inc., Ann Arbor Mich., 1979) (in Exh. 10 hereto).

support for this proposition.[18]   One of the reliability factors articulated in *Daubert* is "whether there is a known or potential rate of error" in an expert's technique.  *Morris v. Goodyear Tire & Rubber Co*., No. CIV-03-655-C, 2004 WL 5522851, at *3 (W.D. Okla. Dec. 17, 2004) (citing *Daubert*, 509 U.S. at 593-94) (internal quotation marks omitted). The emphasis in this criterion is on whether the error rate is *known*.  If it is known, the jury can make an informed assessment of the expert's testimony, without risk of confusion.  *See United States v. Prime*, 431 F.3d 1147, 1153 (9th Cir. 2005) (known error rate of handwriting analysis technique was not grounds for exclusion of expert testimony; "[a]s long as the process is generally reliable, any potential error can be brought to the attention of the jury through cross-examination and the testimony of other experts.").

Here, the error rate associated with Dr. Millette's visual estimation methodology is known to be 30%.  Millette Dep. at 502-03; Rook Dep. at 134-35.[19]   As Dr. Millette explained at his deposition, this means that 30% of the time, an analyst estimating the percent range of a type of particulate in a sample whose actual composition is known would get a result that was different, but close, to the correct value.  Millette Dep. at 502.

---

[18] Plaintiffs erroneously state that under *Daubert*, the known error rate in an expert's technique "mustn't be too great."  Pls.' Mot. at 28.  *Daubert* does not, as Plaintiffs suggest, state that there is some maximum error rate beyond which an expert's testimony should be deemed inadmissible.

[19] Plaintiffs falsely state in their motion that Dr. Millette "does not actually know his error rate."  Plaintiffs' Mot. at 28.  Dr. Millette testified at his deposition that "the determinant rate of error in this particular case is 30 percent."  Millette Dep. at 503.  Dr. Rook agrees that 30% is "the normal anticipated uncertainty" of this method.  Rook Dep. at 134-35.

This concept is not at all difficult for a jury to grasp, contrary to Plaintiffs' and COP's suggestion.

Plaintiffs also baldly assert that Dr. Millette has no quality assurance plan for his work.  Pls.' Mot. at 29.  This proposition is flatly contradicted by Dr. Millette's deposition testimony:

> A.  ... And then we have a quality assurance program where ever so many samples – another one of the analysts will look at it and see if they agree with the percentages that have been determined.
> Q.  So you have done that with these samples, some sort of quality assurance per agreement?
> A.  Yes.
> Q.  What percentage do you have them look at?
> A.  It's about ten percent, I think.

Millette Dep. at 475-76.  Indeed, Dr. Millette's laboratory, MVA Scientific Consultants, is accredited under ISO 17025, the international standard specifying requirements for competence to carry out tests and calibrations, including sampling.[20]

In sum, the known error rate of Dr. Millette's visual estimation methodology and his quality assurance procedures are factors implicating the weight, rather than the admissibility, of his testimony.  Plaintiffs and COP are free to cross-examine Dr. Millette on these topics, and to offer contrary opinions of their own experts.  So long as an expert witness employs in his work the standards of experts in his field, "it is up to the jury to decide whether the expert used the best or most reliable methodology, what weight to accord to his testimony and which of competing experts' opinions should be credited."

---

[20]  MVA's complete accreditations are listed on its website at http://mvainc.com/qualifications_k.html.

*Cook v. Rockwell Int'l Corp.*, No. 90-CV-00181-J, 2006 WL 3533049, at \*6 (D. Colo. Dec. 7, 2006).

### 3.    Plaintiffs offer no basis for exclusion of Dr. Millette's opinion that less than one percent of carbon black per volume does not cause darkening.

In a final attempt to discredit Dr. Millette's testimony, Plaintiffs have formulated a bizarre and confusing argument regarding his opinion that amounts of carbon black less than 1% by volume will not contribute to darkening of a surface. *See* Pls.' Mot. at 30-31; Millette Dep. at 88.   This is nothing more than disagreement with Dr. Millette's conclusion, and as such, is not a *Daubert* issue. *Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 992 (10th Cir. 2003) (court should focus on an expert's methodology rather than the conclusions it generates).

In any event, Plaintiffs' argument regarding Dr. Millette's opinion is seriously off the mark, as it is based on a fatally flawed mathematical conversion of the opinion of another of CCC's experts, Mr. Ronald Joseph.  Relying on the untimely expert report of Bert Fisher,[21] Plaintiffs contend that (1) Mr. Joseph's conclusion that as little as 0.05% carbon black *by weight* will darken a pure white, titanium dioxide paint lab sample surface, equates to 0.1% carbon black *by volume*, (2) therefore, Mr. Joseph's opinion is that 10 times *less* carbon black than the amount predicted by Dr. Millette will produce darkening, and (3) Dr. Millette's opinion has thus been "proved wrong."  Pls.' Mot. at 30-31.  Not only does this mischaracterize Mr. Joseph's work, Dr. Fisher has not analyzed

---

[21] CCC has moved to strike Dr. Fisher's untimely expert report.  *See* Continental Carbon Company's Motion to Strike the Expert Report of J. Berton Fisher and Brief in Support (filed on the same day as this motion).

carbon black and does not seem to understand its properties. His calculation is based on the incorrect assumption that carbon black has the same density as amorphous carbon (approximately 2 grams per cubic centimeter, $g/c^3$). *See* Pls.' Mot. at 31 & Exh. AA thereto (Fisher Rep.) at 11-12. This contradicts the opinion of another of Plaintiffs' experts, Dr. Freeman, who measured the density of carbon black to be about 125 $mg/c^3$, or 0.125 $g/c^3$. *See* Exh. 6 hereto (excerpt from Freeman Report of Feb. 28, 2008, at end of the exhibit). Dr. Freeman's value is within the range of density values for carbon black published in the scientific literature of 0.048 to 0.159 $g/c^3$.[22] Using the Freeman value for the density of carbon black changes Plaintiffs' conversion of Dr. Joseph's weight value to approximately 1.6% by volume, and using the range of values in the scientific literature changes it to a range of values from approximately 1.2% to 4.2% by volume. These values are all higher than the 1% value referred to by Dr. Millette.

**B.      Dr. Millette's Opinion that Sooty Catalyst Is a Darkening Agent Is Reliable.**

Dr. Millette has concluded, based on his observations over several years of conducting microscopic analysis of Ponca City environmental samples, that sooty catalyst emitted by the COP refinery is a darkening agent. Millette Rep. ¶ 19; Millette Dep. at 272. COP contends that this opinion is unreliable and should be excluded. COP Mot. at 5-6. COP does not question the methods Dr. Millette used to find or identify catalyst or to determine whether the catalyst is associated with black soot. It does not

---

[22]      Jean-Baptiste Donnet, et al., eds., *Carbon Black Science and Technology* (2d ed. 1993) (Exh. 11 hereto). ASTM Standard D-6602-03b provides that Donnet's book is "highly recommended to be used as a technical reference" on carbon black. ASTM Standard § 1.4

12

question whether catalyst is emitted from COP.[23]   It does not question whether carbon

soot is associated with COP's catalyst emissions.  In fact, COP's own expert, Dr. Lee, has

found catalyst in samples collected from surfaces outside the COP facility and agreed that

some catalyst particles are associated with carbon.  Lee Dep. at 149-53.  Dr. Lee testified

that he has seen levels of carbon on catalyst up to 3%.  *Id*. at 178.  It is axiomatic that

black carbon soot on light-colored catalyst will cause some darkening.  COP's attempt to

preclude Dr. Millette's testimony that sooty catalyst is a darkening agent is inconsistent

with the testimony of its own expert and is a transparent attempt to prevent the jury from

hearing an opinion which it finds unfavorable.  This is not a valid basis for exclusion of

expert testimony.

The only argument that COP has come up with to support exclusion of Dr.

Millette's opinion on this matter is that it was supposedly "developed for [this]

litigation," a factor which this Court has identified as one that it may consider in

performing its gatekeeping function under Rule 702.  COP Mot. at 5, *citing Morris*, 2004

WL 5522851 at *3.[24]  COP is far off base with its insinuation that Dr. Millette's opinion

is nothing more than litigation-driven supposition.  COP makes much of the fact that Dr.

---

[23] COP's own expert, Dr. Lee, has stated, "I think if you look hard enough in Ponca City, you can probably find catalyst everywhere if you look hard enough." Deposition of Dr. Richard J. Lee ("Lee Dep.," Exh. 12 hereto) at 69.

[24] Of course, even if COP were correct in its assertion that Dr. Millette's opinion regarding sooty catalyst was "formed to meet the exigencies of this litigation," COP Mot. at 5, such testimony is not, as COP suggests, *ipso facto* unreliable under Rule 702. *See Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1120 (10th Cir. 2004) (list of factors that might bear on a judge's gatekeeping determination under Rule 702 is "neither definitive nor exhaustive," and trial judge has "wide discretion both in deciding how to assess an expert's reliability and in making a determination of that reliability.").

Millette has not previously published or reported on catalyst as a darkening agent.  COP Mot. at 5-6.  The simple reason for this, as Dr. Millette explained at his deposition, is that catalyst emissions are a rare type of darkening agent, occurring only around petroleum refineries, and he has not encountered this rare material in surface samples prior to this case.  *See* Millette Dep. at 326.  Thus, it has been through the analyses of the samples obtained from COP that Dr. Millette has developed a full understanding of catalyst as a darkening agent in environmental samples.

COP also complains that Dr. Millette does not cite peer-reviewed scientific literature in support of this particular conclusion.  COP Mot. at 5.  That is not a requirement of admissible expert testimony.   Rather, Rule 702 requires that an expert's opinion be "based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation..."  *Goebel*, 346 F.3d at 991 (quoting *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir. 1995)).  Dr. Millette's conclusion that sooty catalyst is a darkening agent is not speculative, but rather is based on several years of laboratory observations and analysis of samples, *i.e.*, factual evidence in this case.  *See* Millette Rep. ¶¶ 29-30 & App. E (showing examples of dark catalyst found in samples).  One notable example cited by Dr. Millette at his deposition is his observation of a sample of catalyst collected by COP in November 2007 at COP's Fluid Catalytic Cracker ("FCC") Unit #5.  Millette Dep. at 273.  Even without the use of any microscope, the images of this FCC #5 material on the filter clearly show that catalyst from COP is a darkening agent.  The sample shows catalyst covered with soot, dark or

14

black in color, and in a video demonstration by Dr. Lee shows streaking and black coloration when wiped with a paper towel.[25]

In sum, COP offers no valid basis for exclusion of Dr. Millette's opinion that sooty catalyst emitted from COP's refinery is a darkening agent, and the Court should admit this testimony because it is both reliable and helpful to the jury.

## CONCLUSION

For the reasons provided above, CCC respectfully requests that this Court reject Plaintiffs' and COP's motions to exclude Dr. Millette's expert testimony.

DATED:  July 11, 2008

Respectfully submitted,

*/s/ Mark D. Coldiron*
Patrick M. Ryan (OBA No. 7864)
Mark D. Coldiron (OBA No. 1774)
Phillip G. Whaley (OBA No. 13371)
Keith J. Klein (OBA No. 18285)
Patrick R. Pearce, Jr. (OBA No. 18802)
RYAN WHALEY COLDIRON SHANDY PC
900 Robinson Renaissance
119 North Robinson
Oklahoma City, Oklahoma 73102
pwhaley@ryanwhaley.com
(405) 239-6040 (Phone)
(405) 239-6766 (Fax)

- and -

---

[25] *See* Continental Carbon Company's Motion to Exclude in Part the Expert Opinion Offered by Richard J. Lee and Brief in Support (Doc. 375), Exh. 7 (video clip of dark catalyst) & Exh. 15 (photographs of Unit #5 FCC sample).

15

David T. Buente (D.C. Bar No. 429503)
Thomas G. Echikson (D.C. Bar No. 425575)
R. Juge Gregg (D.C. Bar No. 495645)
SIDLEY AUSTIN, LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000 (Phone)
(202) 736-8711 (Fax)

ATTORNEYS FOR DEFENDANTS/THIRD-PARTY
PLAINTIFFS CONTINENTAL CARBON COMPANY
AND CCC USA CORP.

## CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2008, I electronically transmitted the attached document to the following:

Jason B. Aamodt
Will Wright
AAMODT & WRIGHT, PC
Mid-Continent Tower, Ste. 1717
401 S. Boston
Tulsa, OK 74103

Kalyn C. Free
406 S. Boulder Ave., Ste. 101
Tulsa, OK 74103

R. Casey Cooper
Christopher K. Woolsey
Andrea D. Stailey
COOPER, MCKINNEY & WOOLSEY, PLLP
410 S. Boston, Ste. 3300
Tulsa, OK  74103

Christin DiMartino
The Walters Law Firm
The Oldham Building
105 E. 5th St., Ste. 401
Kansas City, MO 64106

**Attorneys for Plaintiffs**

Oliver Howard
Scott R. Rowland
John Henry Rule
Amelia A. Fogelman
Tyler Schwerdtfeger
Craig A. Fitzgerald
GABLE & GOTWALS
100 W. 5th St., Ste. 1100
Tulsa, OK 74103-4217

**Attorneys for Third Party
Defendant ConocoPhillips**

Charles E. Geister, III
Billy M. Croll
Kurt M. Rupert
Michael J. Novotny
Hartzog, Conger, Cason & Neville
201 Robert S. Kerr Avenue
1600 Bank of Oklahoma Plaza
Oklahoma City, OK  73102

**Attorneys for China Synthetic
Rubber Corporation**

 /s/ Mark D. Coldiron
MARK D. COLDIRON

17